# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION

| | |
|---|---|
| SHERRY FOWLER,<br><br>Plaintiff,<br><br>vs.<br><br>GILKEY LUMBER COMPANY, INC.,<br><br>Defendant. | Civil Action No.: 1:23-cv-350<br><br>**COMPLAINT**<br>Jury Trial Demanded |

Plaintiff Sherry Fowler ("Plaintiff" or "Ms. Fowler"), by and through her undersigned counsel, complaining of defendant Gilkey Lumber Company, Inc. ("Defendant" or the "GLC") alleges and says as follows:

## PRELIMINARY STATEMENT

1. Plaintiff brings this action against Defendant for violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2601, *et seq*.

2. Defendant hired Plaintiff on or around August 9, 2004 as a receptionist. Despite an excellent job performance record over her 16 years with the Company, Defendant interfered with Plaintiff's right to take FMLA leave and subsequently fired her in retaliation for taking what should have been deemed qualified leave under FMLA. Plaintiff has suffered significant damages as a result.

## JURISDICTION

3. This Court has jurisdiction over this action pursuant to 28. U.S.C. § 1331 in that this is a civil action arising under the FMLA.

## VENUE

4. Venue is proper in this district under 28 U.S.C. §1391(b)(1) because Plaintiff resides in this district and the Defendant's principal office where Plaintiff worked is located in this district.

## PARTIES

5. Plaintiff is a United States citizen who resides in Rutherford County, North Carolina.

6. Plaintiff is an "employee" as defined by the FMLA. Plaintiff worked for Defendant as a receptionist in Rutherfordton, North Carolina from approximately August 9, 2004 until on or about December 18, 2020. During the entirety of her tenure with Defendant, Plaintiff was allowed one week of paid vacation per year.

7. Upon information and belief, Defendant is a North Carolina corporation with its headquarters in Rutherfordton, Rutherford County, North Carolina.

8. Defendant is an "employer" as defined by the FMLA.

## FACTS

9. In the twelve months prior to November 23, 2020, Plaintiff worked for Defendant on a full-time basis and had worked in excess of 1,250 hours during that time period.

10. At the time Plaintiff worked for Defendant, Defendant employed at least 50 employees but fewer than 500 employees at the location where Plaintiff worked.

11. During her tenure with Defendant, Plaintiff's work performance met or exceeded Defendant's legitimate expectations, and was paid all bonuses for which she was eligible during the time she worked there.

12. In November 2020, Plaintiff obtained advanced permission from her then direct supervisor at GLC, Sherry Daniel ("Daniel"), to take two weeks of unpaid leave beginning on November 23, 2020 so Plaintiff could be with her biological daughter in Kentucky for the birth of Plaintiff's second grandchild.

13. At the end of her first week off, Plaintiff called Daniel on Sunday, November 29, 2020 – Plaintiff's daughter's due date – to ask about Daniel's Thanksgiving and whether things were busy at work. Daniel replied that work was not busy at all, and she asked Plaintiff to keep her informed about the expected grandchild.

14. On Sunday, December 6, 2020, one week after Plaintiff's daughter's due date, Plaintiff again called Daniel to inform her that Plaintiff's daughter still had not given birth and was having to go to the hospital for medical appointments to check on the baby's status. As a result, Plaintiff informed Daniel that she needed to extend her unpaid leave for another week to care for her other grandchild while her daughter was in the hospital and subsequently gave birth. Daniel granted Plaintiff's request and then asked whether Plaintiff planned to stay another week in Kentucky after the new baby was born. Plaintiff responded that she did not plan to stay for another week, but that she did want to stay at least two days after her daughter came home to help care for her and the new grandchild. In response, Daniel told Plaintiff to "just keep us informed."

15. On the morning of Monday, December 7, 2020, Plaintiff was informed by her daughter's physician that her daughter may have been exposed to the Covid-19 virus at her last appointment and that, as a result, her daughter's entire household, including Plaintiff, needed to quarantine. Plaintiff then telephoned Daniel to inform her that she had been directed to quarantine.

16. Later that same day, Michael B. Parton ("Parton"), upon information and belief one of the owners of GLC and its Secretary/Treasurer, telephoned Plaintiff and began berating her for

3

Case 1:23-cv-00350-MOC-WCM    Document 1    Filed 12/17/23    Page 3 of 8

being absent, including falsely accusing her of having left GLC to go to Kentucky without telling anyone her plans. Parton also claimed that GLC was going to be busy that week because 15 containers were coming in. In response, as she had done with Daniel, Plaintiff informed Parton of her situation – including the complications with her daughter's pregnancy and Plaintiff's quarantine status due to possible Covid-19 exposure. She further informed Parton that not only had Daniel approved her leave, but that she had been in frequent contact with Daniel since that time to keep GLC informed of her situation and schedule.

17. Parton then claimed that Plaintiff's daughter's in-laws should come in to help Plaintiff's daughter and let Plaintiff leave. In response, Plaintiff explained that it was not possible for the in-laws to come to Kentucky at that time and, again, that Plaintiff herself was in quarantine for possible Covid-19 exposure. Parton then stated, "Covid doesn't exist at Gilkey Lumber" and further rebuked Plaintiff by asking, "don't you care about Gilkey Lumber/"

18. Plaintiff apologized for the situation, including her quarantine, and then told Parton that she hoped to know more about her daughter's condition after her medical appointment that afternoon. Parton ended the conversation by stating, "Let us know what the doctor says."

19. Plaintiff was so upset by Parton's call that she was literally shaking when the call ended. Plaintiff subsequently called Daniel and told her about the call and the allegations that Parton had made, and Daniel responded that she knew Parton's call would upset Plaintiff.

20. When, given her approved leave and frequent contact with Daniel about her schedule thereafter, Plaintiff asked why Parton had claimed that Plaintiff had left without telling anyone her plans, Daniel could give no response. Notably, however, Daniel did subsequently say that the 15 containers that Parton had claimed were due had all been cancelled due to some of the drivers being diagnosed with the Covid-19 virus.

4

21. On the afternoon of Monday, December 7, 2020, Plaintiff learned that an ultrasound had shown that her daughter's baby was breech, and she informed Daniel of the same.

22. On Tuesday, December 8, 2020, Plaintiff informed Daniel that Plaintiff's daughter was doing exercises as directed by her physician in an attempt to turn the baby, and that her daughter would be returning to the hospital that afternoon.

23. On Wednesday, December 9, 2020, Plaintiff informed Daniel that her new granddaughter had been delivered by C-section. When Plaintiff's daughter subsequently began experiencing physical complications from the childbirth, Plaintiff wrote Daniel at 7:27 a.m. on Thursday, December 10 to inform her of that as well.

24. On Friday, December 11, Plaintiff's daughter and new granddaughter finally came home from the hospital. Because of the physical complications from the delivery and the mental effects caused by her medications, however, Plaintiff's daughter was incapable of even self-care, including performing regularly daily activities, let alone caring for both a newborn and a toddler. Indeed, Plaintiff's daughter was subsequently treated by her healthcare provider for these complications. As a result, Plaintiff became her daughter's and grandchildren's primary care giver on December 11, 2020, and she informed Daniel of this fact.

25. On Sunday, December 13, 2020, Plaintiff informed Daniel that she would be able to return to North Carolina on Friday, December 18, 2020 because her quarantine would be over, and her son, who had been in Mexico, would be taking over her daughter's and grandchildren's care after he cleared quarantine.

26. As a result, on Friday, December 7, 2020, Defendant knew that Plaintiff was being quarantined for possible exposure to Covid-19, and by at least Sunday, December 13, 2020, Defendant knew that Plaintiff would be caring for her biological daughter who was not capable of

self-care because of both a physical disability and the effects of medications prescribed to her to address the same.

27. Thus, by at least December 13, 2020, Defendant knew that Plaintiff's extended leave could be for an FMLA-qualifying reason. However, Defendant failed to notify Plaintiff of her eligibility to take FMLA leave or her rights under the FMLA thereafter.

28. In fact, upon information and belief, during the entirety of Plaintiff's tenure with GLC, Defendant also willfully failed to prominently post a general notice in the workplace explaining the FMLA's provisions and informing Defendant's employees of their rights thereunder.

29. Instead, on Tuesday, December 15, 2020, Daniel wrote Plaintiff and surprisingly stated that:

> "[M]ike and Tim [Parton] have talked, although they haven't come up with a decision yet, they said for you to go ahead and don't plan on coming in next week because there will be no trucks going out, and they will let you know something by next week about your job."

30. In response, Plaintiff told Daniel how upsetting Parton's prior call had been and how it had affected her nerves. She also again informed Daniel that she was leaving Kentucky on Friday morning to return to North Carolina.

31. During Plaintiff's drive from Kentucky to North Carolina on Friday, December 18, 2020, Daniel called Plaintiff and informed her that Defendant was summarily terminating her employment. When Plaintiff asked why, Daniel stated that Plaintiff caring for her daughter had caused Plaintiff to be gone longer that Defendant wanted her to be gone, and – despite the fact that this leave was unpaid – Parton could not get over the fact that Plaintiff had taken her one week of paid vacation in July instead of saving it for the birth of her new grandchild.

6

32. For context, Plaintiff took her one week of paid vacation in July 2020 to attend the wedding of her other daughter. At the time, Plaintiff did not know that her daughter in Kentucky was pregnant.

**COUNT ONE**
**Interference with Plaintiff's Rights and Denial of Benefits in Violation of the**
**Family and Medical Leave Act**
29 U.S.C. 2615

33. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

34. During the time period at issue, Defendant was an employer covered by the FMLA pursuant to 29 U.S.C. §2601 *et seq.* because it was a private business that employed fifty or more employees for each working date for at least twenty workweeks in the year prior to Plaintiff's termination.

35. During the time period at issue, Plaintiff was an FMLA-eligible employee because she was employed by Defendant for over 16 years prior to requesting leave and had been employed for Defendant for over 1,250 hours in the twelve-month period prior to her request.

36. Plaintiff was entitled to leave and job reinstatement after the leave ended under the FMLA because by at least December 13, 2020 Defendant had acquired knowledge that Plaintiff's leave may be for an FMLA-qualifying reason, yet Defendant willfully failed to inform Plaintiff of her eligibility or rights under the FMLA thereafter.

37. Defendant also willfully and summarily terminated Plaintiff's employment for taking FMLA-qualifying leave.

38. In addition, Defendant willfully failed to otherwise follow the FMLA notice requirements under 29 C.F.R. §825.300.

39. Defendant has thus willfully engaged in prohibited conduct by interfering with, restraining, or denying Plaintiff's rights and benefits under the FMLA.

40. As a result of Defendant's wrongful acts and omissions in willful violation of the FMLA, Plaintiff has suffered and continues to suffer substantial losses, including past and future lost wages and benefits. Plaintiff is also entitled to liquidated damages, attorneys' fees and costs, and other damages as recoverable by law.

WHEREFORE, Plaintiff respectfully prays the Court as follows:

1. That she be awarded damages for her past and future loss of wages and benefits, plus interest;

2. That she be awarded liquidated damages equal to the sum of the amount of damages and interest of her past and future loss of wages and benefits;

3. That she be awarded her costs and reasonable attorneys' fees incurred in connection with this action;

4. That this case be tried by a jury; and

5. That she have such other and further relief as the Court deems just and proper.

STRIANESE HUCKERT, LLP

*/S/ T. Jonathan Adams*

_____
T. Jonathan Adams
N.C. Bar No. 21890
3501 Monroe Road
Charlotte, North Carolina  28205
(704) 966-2106
Jadams@strilaw.com